IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-2137-NYW

WILLIAM RALPH MCGANNON,

      Plaintiff,

v.

CAROLYN W. COLVIN,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This civil action arises under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34 (2012) for review of the Commissioner of Social Security's final decision denying Plaintiff William Ralph McGannon's ("Plaintiff" or "Mr. McGannon") application for Disability Insurance Benefits ("DIB"), and is before the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c). [#15, #17, dated December 3, 2015].[1]  After carefully considering Plaintiff's Opening Brief [#19], Defendant's Response Brief [#20], the entire case file, the administrative record, and the applicable case law, I AFFIRM the Commissioner's decision.

---

[1] For consistency and ease of reference, this Order utilizes the docket number assigned by the Electronic Court Filing ("ECF") system for its citations to the court file.  For the Administrative Record, the court refers to the page number associated with the Record, which is found in the bottom right-hand corner of the page.  For documents outside of the Administrative Record, the court refers to the page number assigned in the top header by the ECF system.  Where the court refers to the filings made in the ECF system in this action, it uses the convention [#___].

## BACKGROUND

On July 23, 2012, Mr. McGannon filed an application for DIB under Title II of the Act. [#13-5 at 141-47].   Prior to filing his application, Mr. McGannon, whose education includes a bachelor's degree, was employed for nearly twenty-four consecutive years at United Parcel Service ("UPS").   *See* [#13-2 at 53; #13-5 at 142].   At UPS, Mr. McGannon was a self-described "Box Handler," [#13-6 at 176], (or "Packaging Clerk" [#13-3 at 75]), who lifted approximately 1,100 10-70 lbs. parcels and transported them about six feet, all-day, every day [#13-6 at 177]. Mr. McGannon alleges he became disabled on December 1, 2011 at the age of 43.   [#13-3 at 67]. The record does not indicate that a traumatic incident occurred on that date; rather Mr. McGannon appears to allege that by December 11, his various impairments consisting of congestive heart failure, hypertension, bilateral kidney problems, chest pain, and anxiety had rendered him disabled.[2]   [#13-3 at 70; #13-4 at 80].   Plaintiff's disability claim was denied at the initial determination stage on February 1, 2013.   [#13-4 at 80,].   Mr. McGannon then requested a hearing before an Administrative Law Judge on February 14, 2013.   [*Id.* at 87].   On January 28, 2014, Administrative Law Judge Jennifer A. Simmons ("ALJ") held a hearing, [#13-2 at 30], at which Mr. McGannon was represented by attorney Brandon Selinsky.   [#13-4 at 139].

At the hearing, Mr. McGannon testified that he stopped working at UPS early in 2012 due to fatigue, shortness of breath, light-headedness, dizziness, and lack of coordination.   [#13-2 at 35].   He testified that as a result of his condition, he could stand no more than two hours in an eight-hour day at maximum intervals of fifteen minutes, and sit no longer than two hours in an eight-hour day at maximum intervals of twenty minutes.   [*Id.* at 40-41].   Mr. McGannon testified that he became "fidgety" and got "hot flashes" when sitting for twenty minutes or longer, but

---

[2] Mr. McGannon indicated in his testimony before the Administrative Law Judge that the origins of his anxiety are unknown to him.   He seems to suggest it was included in error.   Regardless, he has never been treated for anxiety.   [#13-2 at 52-53].

acknowledged he was not sure if those symptoms were related to his health problems.  [*Id.* at 41].  Mr. McGannon also testified that he developed symptoms of gout beginning in January 2013.  [*Id.* at 42-47].  Mr. McGannon testified that during a gout flare-up, he is bedridden by pain in his knees and ankles and moves around his apartment only with the assistance of a walker.  [*Id.* at 42-43].  He testified that a gout flare-up happens every three weeks on average and lasts three to four days.  [*Id.* at 42-44].

With respect to daily activities and lifestyle, Mr. McGannon testified that he lives alone and is able to prepare simple meals for himself, brush his teeth, and bathe.  [#13-2 at 43, 49].  He does not have a driver's license and so he does not drive, but he uses public transportation and receives car rides from friends.  [*Id.* at 49].  He goes to the gym and "the store."  [*Id.*]  His mother, who lives close to him, drives him to the grocery store where he uses an electric scooter to shop. [*Id.* at 49, 55].  He also testified that he occasionally takes his grandchildren to see a movie and he visits his grandmother.  [*Id.* at 51].

Robert L. Schmidt testified at the hearing as a vocational expert ("VE").  [*Id.* at 56].  The ALJ posed three hypothetical questions to the VE.  The first question was whether an individual with a bachelor's degree could perform any job in the national economy that involved no more than two hours of standing but unlimited sitting in an eight-hour day; lifting, carrying, pushing, or pulling ten pounds occasionally and less than ten pounds frequently; no climbing of ladders, ropes, or scaffolds; occasional stair or ramp climbing; and could involve frequent crouching, crawling, stooping, or kneeling.  [#13-2 at 56-57].  The VE testified that the hypothetical person could perform the jobs of charge account clerk, telemarketer, and call out operator.  [*Id.* at 57-58].  The ALJ's second hypothetical question was whether an individual with the same restrictions who missed two days of work a month could perform jobs in the national economy.

[*Id.* at 58].  The VE testified that there are no jobs for such an individual.  [*Id.*].  The third hypothetical was whether an individual who was off task 20% of the workday could perform jobs in the national economy.  [*Id.* at 59].  The VE testified there are no jobs available for such an individual.  [*Id.*].  The ALJ issued her decision on April 17, 2014, concluding Mr. McGannon is not disabled.  [*Id.* at 9].

Mr. McGannon requested a review of the ALJ's decision, which the Appeals Council denied on July 27, 2015.  [#13-2 at 1].  The decision of the ALJ then became the final decision of the Commissioner.  20 C.F.R. § 404.981; *Nielson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted).  Mr. McGannon filed this action on September 28, 2015.  [#1].  The court has jurisdiction to review the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole.  *Angel v. Barnhart,* 329 F.3d 1208, 1209 (10th Cir. 2003); *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted).  The court may not reverse an ALJ simply because it may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in his decision.  *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart,* 395 F.3d 1168, 1172 (10th Cir. 2005).  "It requires more than a scintilla, but less than a preponderance." *Id.*  Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992)
(citation omitted).   "[The court will] not reweigh the evidence or retry the case, [but must]
'meticulously examine the record as a whole, including anything that may undercut or detract
from the ALJ's findings in order to determine if the substantiality test has been met.'" *Flaherty
v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (quoting *Grogan v. Barnhart,* 399 F.3d 1257,
1262 (10th Cir. 2005).   Nevertheless, "if the ALJ failed to apply the correct legal test, there is a
ground for reversal apart from a lack of substantial evidence."   *Thompson v. Sullivan,* 987 F.2d
1482, 1487 (10th Cir. 1993) (citation omitted).

## ANALYSIS

### I.    The ALJ's Decision

An individual is eligible for DIB benefits under the Act if he meets the insured status
requirements, has not attained retirement age, has filed an application, and is under a disability.
42 U.S.C. 423(a)(1).   A disability is "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment which can be expected to
result in death or…last[s] for a continuous period of not less than 12 months…" § 423(d)(1)(A).
An individual is determined to have a disability "only if his physical or mental impairment or
impairments are of such severity that he is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in any other kind of substantial
gainful work which exists in the national economy…" § 423(d)(2)(A).

The Commissioner has developed a five-step evaluation process for determining whether
a claimant is disabled under the Act.  20 C.F.R. § 404.1520(a)(4).  *See also Williams v. Bowen*,
844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail).  "If a determination
can be made at any of the steps that a claimant is or is not disabled, evaluation under a

subsequent step is not necessary." *Williams*, 844 F.2d at 750. Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied. *Id.* Step two considers whether the claimant has a medically severe impairment or combination of impairments, as governed by the Secretary's severity regulations. *Id.* If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, she is not eligible for disability benefits. *Williams*, 844 F.2d at 751. If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three. *Id.* Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d). *Id.* (quoting *Bowen v. Yuckert*, 107 S. Ct. 2287, 2291 (1987). At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity ("RFC"), which defines what the claimant is still "functionally capable of doing on a regular and continuing basis, despite [his] impairments: the claimant's maximum sustained work capability." *Id.* The ALJ then compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work. *See Barnes v. Colvin*, No. 14-1341, 2015 WL 3775669, at *2 (10th Cir. June 18, 2015) (internal quotation marks omitted) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996)) (noting that the step-four analysis includes three phases: (1) "evaluat[ing] a claimant's physical and mental [RFC]"; (2) "determin[ing] the physical and mental demands of the claimant's past relevant work"; and (3) assessing "whether the claimant has the ability to meet the job demands found in phase two despite the [RFC] found in phase one."). "If the claimant is able to perform his previous work, he is not disabled." *Williams*, 844 F.2d at 751. "The

claimant bears the burden of proof through step four of the analysis." *Neilson v. Sullivan*, 992

F.2d 1118, 1120 (10th Cir. 1993).

At step five, the burden shifts to the Commissioner to show that a claimant can perform

work that exists in the national economy, taking into account the claimant's RFC, age, education,

and work experience. *Id.*

> A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's "RFC category," the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). . . .
>
> If a conclusion of "not disabled" results, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. However, . . . [t]he decision maker must then consider all relevant facts to determine whether claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations.
> . . .
> Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain . . . .

*Williams*, 844 F.2d at 751-52 (footnotes omitted).

The ALJ found Mr. McGannon was insured for DIB through December 31, 2017. [#13-2

at 15]. Next, following the five-step evaluation process, the ALJ determined that Mr. McGannon

had not engaged in substantial gainful activity since his alleged onset date of December 1, 2011.[3]

[*Id.*]. In step two, the ALJ determined Mr. McGannon had the following severe impairments:

---

[3] The ALJ noted that some ambiguity remains about the source of $2,748 from UPS and $7,221 from Aetna Life Insurance Company posted to Mr. McGannon's account after his alleged onset date on on-set of disability. The ALJ limited for the purpose of her decision the finding that Mr. McGannon had not engaged in substantial gainful employment after his alleged on-set date. [#13-2 at 15-16].

congestive heart failure, cardiomegaly, pulmonary hypertension, obesity, stage III chronic kidney disease, and history of polysubstance (cocaine and alcohol) abuse. [*Id.* at 16]. At step three, the ALJ determined that Mr. McGannon did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). [*Id.* at 18]. At step four, the ALJ found that Mr. McGannon had the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a), [*id.* at 19], and was unable to perform his past relevant work as a packaging clerk [*id.* at 24]. At step five, considering Mr. McGannon's age, education, work experience, and RFC, the ALJ found there are jobs that exist in significant numbers in the national economy that Mr. McGannon can perform. [*Id.*].

Mr. McGannon challenges the ALJ's determination of his RFC on two grounds. First, he takes issue with the ALJ's discounting of the opinion of his treating cardiologist, Dr. Thomas A. Haffey. Second, Plaintiff argues that the ALJ improperly assessed his credibility, in particular by failing to consider his strong work history. [#19 at 3].[4] The court considers each of these arguments in turn.

## II.      The RFC Determination

On January 21, 2014, Dr. Haffey completed a "Medical Opinion Re: Ability to do Work Related Activities," (the "Assessment") evaluating Mr. McGannon's ability to perform physical work. [#13-9 at 361-64]. Dr. Haffey concluded that Mr. McGannon can stand, walk, and sit a total of two hours each during an eight-hour work day, is limited to sitting for two hours during

---

[4] Defendant contends that Mr. McGannon's arguments on appeal "focus only on the opinion of Dr. Haffey—his cardiologist—and Plaintiff's credibility—which is based on his heart problems," and thus declined to address Plaintiff's history of kidney problems or other ailments as mentioned in the record. [#20 at 3 n.2]. This court's review of the Parties' briefing is consistent with Defendant's conclusion, and Mr. McGannon did not file a Reply or otherwise contest Defendant's classification of the arguments on appeal. Accordingly, the court also limits its review to the ALJ's treatment of Dr. Haffey's opinion and Plaintiff's credibility.

an eight-hour workday at maximum intervals of twenty minutes before changing position, and must walk for fifteen minutes after engaging in fifteen minutes of activity. [#13-9 at 361-62]. Dr. Haffey also opined that Mr. McGannon is limited to lifting and carrying ten pounds frequently and twenty pounds occasionally, can only occasionally twist, stoop, crouch, or climb stairs and ladders, and that these impairments adversely affect his ability to reach overhead and in front and push and pull. [*Id.* at 362]. Finally, Dr. Haffey determined that Mr. McGannon would be absent from work at least four days each month. [*Id.* at 364]. In contrast, the ALJ found that Mr. McGannon has the RFC to perform sedentary work, except that he can stand and/or walk two hours in an eight-hour workday; he can sit at least six hours in an eight-hour workday; he can lift, carry, push, and pull ten pounds occasionally and less than ten pounds frequently; he should never climb ladder/ropes/scaffolds; but he may occasionally climb stairs and ramps, and can frequently crouch, crawl, stoop, and kneel. [#13-2 at 19].

The ALJ gave three reasons for attributing little weight to Dr. Haffey's Assessment: (1) Dr. Haffey's own progress notes do not support his opinion; (2) Mr. McGannon's asserted inability to sit more than two hours in an eight-hour work day is not consistent with his reported activities of daily living; and (3) Dr. Haffey completed the Assessment with Mr. McGannon's assistance and the opinion is primarily based on Mr. McGannon's subjective statements. [#13-2 at 22-24]. Nonetheless, Mr. McGannon asserts that the ALJ failed to articulate valid reasons for discounting Dr. Haffey's Assessment, which, he argues, was not contradicted by the medical record or an examining medical source; and alternatively argues that the ALJ offered no "good reasons" for rejecting Dr. Haffey's opinion.

A.    The Medical Record

Shortly after his alleged onset date of disability on December 1, 2011, Mr. McGannon had two separate incidents that required extended stays in the hospital.  *See* [#13-7 at 286-89, #13-8 at 314-16].   On January 18, 2012, he was admitted for seven days with an episode of congestive heart failure.  [#13-7 at 286, 293].  On admission, he was grossly volume overloaded and in hypertensive emergency with severe pulmonary edema.    [#13-8 at 344].    An echocardiogram showed an ejection fraction of 25%,[5] and he was diagnosed with Grade IV diastolic heart failure.  [#13-7 at 284, #13-8 at 344].  The cause of this incident was attributed to uncontrolled hypertension, alcohol, and cocaine.  [#13-8 at 344].  Dr. Haffey discussed with Mr. McGannon the nature and extent of his disease, alternative methods of therapy, and the possibility of a heart transplant.  [#13-7 at 288].

On January 30, 2012, six days after being discharged, Mr. McGannon was again admitted to a hospital due to epistaxis, shortness of breath, and lightheadedness.  [#13-8 at 314].  During this stay, he was found to have hypertensive urgency with poorly controlled blood pressure.  [*Id.*].  He was also volume overloaded and had a prolonged ventricular tachycardia and rapid atrial fibrillation.  [*Id.*].  Mr. McGannon was again counseled about cocaine abuse and he was discharged on February 3, 2012.  [*Id.* at 314-15].

By April 2012, Mr. McGannon's blood pressure had returned to 120/80.  [#13-10 at 481]. In May 2012, Dr. Haffey expressed concern in his notes that Mr. McGannon's blood pressure

---

[5]  Ejection fraction measures "how much blood the left ventricle pumps out with each contraction."  "A measurement under 40 may be evidence of heart failure or cardiomyopathy."  "A normal heart's ejection fraction may be between 50 and 70."  *See* Am. Heart Ass'n, Ejection Fraction Heart Failure Measurement, http://www.heart.org/HEARTORG/Conditions/HeartFailure/SymptomsDiagnosisofHeartFailure/ Ejection-Fraction-Heart-Failure-Measurement_UCM_306339_Article.jsp#.V5-yhfkrLcs (last visited August 2, 2016).  *See also* [#19 at 9 n.2; #20 at 3 n.3].

was "way too high" at 150/100.  [*Id.* at 477].  Dr. Haffey again mentioned the possibility of a heart transplant and remained guarded in his prognosis, but recorded that Plaintiff believed his symptoms had improved with the medication.  [#13-7 at 244].  By September 2012, Mr. McGannon's blood pressure had returned to 110/80 and Dr. Haffey noted Mr. McGannon "seemed happy with the way he is g[e]tting along...[h]is only concern is continued brief episodes of foot pain knee pain thinks it may be gout."  [*Id.* at 238, 471-73].  In April 2013, Mr. McGannon's blood pressure was 110/80, his ejection fraction had risen to 43%, and he reported playing basketball the day before. [*Id.* at 458-60].  Dr. Haffey noted in a September 2013 report that Plaintiff's "labs appear[] to be within acceptable ranges.  He voices his tolerance of his current medical plan and his willingness to continue on what appears to be a successful effort to minimize his [cardiovascular] risk factors." [*Id.* at 453-54].  In October 2013, Mr. McGannon returned to Dr. Haffey at the urging of his nephrologist, who was concerned about his blood pressure and heart rate. [#13-10 at 447].  However, Mr. McGannon reported "no chest pressure, no lightheadedness, no chest pain, no dyspnea on exertion, no fatigue…," and Dr. Haffey again noted that Plaintiff "seems happy with the way he is getting along."  [*Id.* at 449-450]. Cardiology notes from November 2013 indicate that Mr. McGannon's Functional Capacity was at NYHA level III.[6]  [*Id.* at 44].  In early January 2014, Dr. Haffey classified Mr. McGannon as NYHA II.[7]  [*Id.* at 442].  A few weeks later, while completing the Assessment, Dr. Haffey

---

[6] Heart failure may be described using the New York Heart Association ("NYHA") Functional Classification.  *See* [#20 at 5 n.5].  NYHA Class III Heart failure means "Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea.   *See*   Am.   Heart   Ass'n,   Classes   of   Heart   Failure, http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp#.V57i_I-cGuU (last visited August 2, 2016).

[7] NYHA Class II Heart failure means "Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). *See* Am. Heart     Ass'n,     Classes     of     Heart     Failure,

opined that Plaintiff could sit only twenty minutes at a time and two hours per day and stand only

fifteen minutes at a time and two hours per day, despite the recent classification of NYHA II.

[#13-7 at 361-364].  Mr. McGannon saw Dr. Haffey one additional time in February 2014.  [#13-

10 at 432].

     B.    <u>The ALJ's Findings</u>

The governing regulations instruct that the ALJ will consider the medical records in the

case record "together with the rest of the relevant evidence."  20 C.F.R. § 404.1527(b).

Generally, more weight is given to opinions from treating sources, and they receive controlling

weight if the opinion is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence" in the case

record.  20 C.F.R. § 404.1527(c)(2).  If the ALJ does not attribute controlling weight to the

treating source's opinion, she will consider the following factors in determining what degree of

weight is appropriate: length of the treatment relationship and frequency of examination; nature

and extent of the treatment relationship; supportability; consistency; specialization; and other

factors, such as relevant information that tends to support or contradict the opinion.  *Id.* at §

404.1527(c)(2)(i)-(ii) and (c)(3)-(6).  However, an ALJ may disregard a treating physician's

opinion when it is not supported by the medical record.  *Doyal v. Barnhart*, 331 F.3d 758, 762

(10th Cir. 2003) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th

Cir. 1994)).  And, the ALJ is not required to explicitly address each of the factors listed above;

indeed, "[n]ot every factor for weighing opinion evidence will apply in every case."  *Oldham v.*

*Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (citation omitted).  *See also Riviera v. Colvin*, 629

F. App'x 842, 845 (10th Cir. 2015) ("the ALJ did not discuss all the factors, but he cited them,

---

http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-
Heart-Failure_UCM_306328_Article.jsp#.V57i_I-cGuU (last visited August 2, 2016).

and his decision was specific enough for us to determine what weight he gave the opinions and why."). The regulations require only that the ALJ "give good reasons" for the weight given to the treating physician's opinion. *Doyal*, 331 F.3d at 762 (citation omitted). *See also* Social Security Regulation ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996) ("If the [ALJ's] RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). Similarly, if the ALJ rejects the opinion of the treating source completely, she must give "specific, legitimate reasons for doing so." *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (internal quotations and citation omitted).

Upon review, this court finds that the ALJ sufficiently referenced Plaintiff's medical history in finding that the medical evidence did not support Dr. Haffey's opinion. With respect to Dr. Haffey's progress notes, the ALJ first noted the many instances in the record where Mr. McGannon represented feeling well and denied chest pain, shortness of breath, or fatigue. [#13-2 at 20-21]. *See, e.g.,* [#13-7 at 238 (September 2012: "[patient] seems happy with the way he is g[e]tting along" and "reports no chest pressure…no chest pain…no fatigue…no palpitations…no shortness of breath"); #13-7 at 235 (November 2012: "[p]atient states that he has not had any chest pain [and] and he has not had…shortness of breath…"); #13-10 at 461 (January 2013: "[p]atient states that he has not had any chest pain he has not had palpitations or shortness of breath"); #13-10 at 458 (April 2013: "[p]atient states that he has not had any chest pain he has not had palpitations or shortness of breath"); #13-10 at 449 (October 2013: "[p]atient reports no chest pressure…no lightheadedness…no chest pain…no fatigue…no palpitations…no shortness or breath")]. The ALJ observed that Plaintiff had reported problems with side effects from medication, but there was minimal evidence to support the reports of severe side effects, and rather, the evidence indicated that Plaintiff had denied significant side effects on multiple

occasions.  *See, e.g.,* [#13-7 at 235, 238; #13-10 at 448, 458, 461; #13-11 at 544, 548].  The ALJ also considered that Plaintiff at times was non-compliant with his medications and the recommended diet management.  *See, e.g.,* [#13-7 at 231, 248, 250; #13-10 at 450].  *See also Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) ("The failure to follow prescribed treatment is a legitimate consideration in evaluating the validity of an alleged impairment.") (citation omitted).  On the day Dr. Haffey completed the Assessment, he noted that Mr. McGannon "seems happy with the way he is getting along…[n]o problems or side effects to medication"; Dr. Haffey recorded a normal exam, and reported Plaintiff's complaints of "dyspnea on exertion, fatigue…and shortness of breath," but "no chest pressure, no lightheadedness, no chest pain…no palpitations."  [#13-10 at 438].

Additionally, the ALJ determined that, "other than reporting to Dr. Haffey that he will need a heart transplant, there is no objective evidence or physician recommendation in the record."  [#13-2 at 21].  The court notes that in January 2012, during a cardiology consultation, Dr. Haffey discussed with Plaintiff "alternative methods of therapy including the possibility of needing a defibrillator, possibly heart transplant."  They decided on a Lasix drip, to "see how he improves clinically."  [#13-7 at 288].  In May 2012, Dr. Haffey again mentioned the possibility of a heart transplant and remained guarded in his prognosis, but recorded that Plaintiff believed his symptoms had improved with the medication.  [#13-7 at 244].  The medical record indicates that Plaintiff continued to improve; and while Dr. Haffey diagnosed Plaintiff with Grade IV diastolic heart failure in January 2012, [#13-7 at 285], he later reclassified Plaintiff at Grade III and then Grade II.  [#13-10 at 442, 438].  Indeed, as of early 2014, Plaintiff reported improvement with controlled blood pressures, no edema, and no chest pain.  [#13-2 at 21].  *See, e.g.,* [#13-10 at 432-435].  Mr. McGannon contends that the ALJ gave no consideration to the

factors listed in section 404.1527, or to Dr. Haffey's specialty and history of treating Plaintiff. While the ALJ may not have expressly discussed those factors, the record demonstrates that she adequately considered them. The ALJ acknowledged Dr. Haffey as the treating physician with a specialty in cardiology and she discussed Plaintiff's medical records dating back to before the onset date. *See, e.g.,* [#13-2 at 21]. The controlling law requires nothing further. *See Mays v. Colvin*, 576 F.3d 569, 576 (10th Cir. 2014) (holding sufficient that the ALJ recognized a doctor was the treating physician, discussed the doctor's treatment records going back several years, and considered whether the doctor's opinion was consistent with the medical evidence). The court finds there is substantial evidence in the medical record to support the ALJ's conclusion regarding the inconsistency between Dr. Haffey's progress notes and his opinion.

The ALJ also considered Mr. McGannon's testimony regarding his daily activities. In particular, Mr. McGannon lives alone, is able to prepare simple meals for himself, and uses public transportation and rides from friends to visit "the gym or the store," his grandmother, and to take his grandchildren on outings to the movies. [#13-2 at 20]. *See also* [#13-2 at 49-51]. The ALJ observed that Mr. McGannon "described performing routine activities of daily living including self-care tasks, laundry, and shopping," [#13-2 at 20]. She also observed that treatment records demonstrated Mr. McGannon reported playing basketball and walking for exercise. [#13-2 at 21]. *See also* [#13-11 at 536, 539; #13-10 at 458].

Finally, the ALJ considered the fact that Dr. Haffey completed the Assessment with Mr. McGannon's assistance. [#13-2 at 23; #13-10 at 439]. An ALJ permissibly affords reduced weight to a treating physician's opinion when that opinion is based on the patient's subjective complaints rather than a physical examination. *See Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009); *Riviera v. Colvin*, 629 F. App'x 842, 845 (10th Cir. 2015) ("In weighing their

opinions, it was entirely appropriate for the ALJ to consider where [the doctors] got their information"). Because the ALJ did not find Mr. McGannon to be fully credible, addressed in more detail below, she gave reduced weight to the Assessment that was based, at least in part, on Mr. McGannon's self-reports to Dr. Haffey. *See Boucher v. Astrue*, 371 F. App'x 917, 923-34 (10th Cir. 2010) (affirming ALJ who declined to give controlling weight to treating physician's opinion because the opinion was based in part on claimant's self-report, which ALJ found unreliable). This similarly provides a basis for the ALJ not adopting Plaintiff's hand use limitations and his purported need to alternately sit and stand. *See* [#19 at 17-19]. *See Miller v. Astrue*, 496 F. App'x 853, 859 (10th Cir. 2012) ("the omission of [certain] limitations…was not error because no limitations in this regard were borne out by the record evidence") (citation omitted).

The ALJ acknowledged that Mr. McGannon had impairments, including his cardiac condition, which limited his ability to work. With this in mind, the ALJ found that Plaintiff was capable of performing only sedentary work and that Plaintiff was unable to return to his previous job of a packaging clerk, which is classified as requiring a medium level of exertion. However, the ALJ also found that since Plaintiff's "acute heart failure in January 2012, examination findings and diagnostic techniques generally show no significant abnormalities that could not be remedied with appropriate medical treatment, medications, and diet management, resulting in minimal residuals." [#13-2 at 23]. The court will not reverse an ALJ simply because she may have reached a different result based on the record. Instead, the question is whether there is substantial evidence to show the ALJ was justified in her decision. *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990). *See also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's findings from being supported by substantial evidence."). Based on its review of the determination and Plaintiff's medical records, this court finds that the ALJ sufficiently supported her reasons for attributing little weight to Dr. Haffey's Assessment.

C.  Weight Attributed to State Examiner's Opinion

In declining to give Dr. Haffey's Assessment controlling weight, the ALJ gave substantial weight to the Disability Determination Explanation prepared by the State agency medical examiner, Dr. Paul Barrett, on January 31, 2013. [#13-2 at 23-24; #13-3 at 67-75]. "In appropriate circumstances, opinions from State agency medical and psychological consultants… may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996). When an ALJ considers findings of a State agency, "the administrative law judge must explain in the decision the weight given to the opinions of a State agency…as the administrative law judge must do for any opinions [considered by the ALJ]." 20 C.F.R. § 404.1527(e)(2)(ii).

The ALJ gave Dr. Barrett's opinion substantial weight because it was "consistent with and supported by the exam findings in the medical evidence." [#13-2 at 23]. Dr. Barrett found that Mr. McGannon had medically determinable impairments, but that the objective medical evidence did not substantiate Plaintiff's representations concerning the severity and limiting effects of the impairments, and that Mr. McGannon was not disabled. [#13-3 at 72, 75-76]. Dr. Barrett specifically found that Mr. McGannon's statements that he could not walk for more than fifteen minutes were inconsistent with his stated ability to grocery shop for 1.5 hours, and he considered Plaintiff's statements regarding his exertional limits only partially credible. [*Id.* at 73]. Dr. Barrett concluded that Mr. McGannon was capable of sitting approximately six hours during an eight-hour work day and standing or walking two hours in an eight-hour work day.

[*Id.*].  These findings are consistent with the ALJ's determination of Mr. McGannon's RFC, *see* [#13-2 at 19], and there is substantial evidence in the medical record that supports the State agency finding.

### III.    The ALJ's Assessment of Mr. McGannon's Credibility

Mr. McGannon generally reasserts his challenges to the ALJ's treatment of Dr. Haffey's opinion, but also objects that the ALJ did not consider his uninterrupted 25-year work history. [#19 at 19-20].  Specifically, Plaintiff argues that his work history counters "the possibility of malingering and certainly ought to have been considered in the ALJ's credibility assessment." [*Id.* at 20].

"Where a claimant has a good work history, she is entitled to substantial credibility when she then asserts that she is unable to work."  *Tyson v. Apfel*, 107 F. Supp. 2d 1267, 1270 (D. Colo. 2000).  Nevertheless, "[c]redibility determinations are peculiarly the province of the finder of fact," and the court will not upset those determinations when they are supported by substantial evidence.  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir.1990)).  "[F]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Id.*  (quoting *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988)).  The Tenth Circuit "does not require a formalistic factor-by-factor recitation of the evidence…[s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility."  *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009) (quoting *Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir. 2000)).

After considering the medical evidence, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but

found that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible. [#13-2 at 20]. The ALJ then gave specific reasons for her finding. Mr. McGannon occasionally missed his medications and was non-compliant with his diet management. [#13-2 at 22]; SSR 82-59, 1982 WL 31384, at *1 (January 1, 1982) ("Individuals with a disabling impairment which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under a disability, unless there is a justifiable cause for the failure to follow such treatment.") (emphasis omitted). Mr. McGannon testified his medications caused side effects, [#13-6 at 204], but outside the DIB application process, he frequently denied to Dr. Haffey any side effects from medication. [#13-10 at 450, 453, 458, 461]. *See Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000) (finding a reported symptom not credible because the claimant had not reported it to her doctor). Despite testifying to daily shortness of breath and dizziness, [#13-2 at 39-40], Mr. McGannon frequently denied these symptoms to Dr. Haffey. *See* [#13-10 at 449, 469, 472]. *See also Shepherd v. Apfel*, 184 F.3d 1196, 1202 (10th Cir. 1999) (concluding that inconsistencies between claimant's testimony and the reports given to his consultative examiners constituted specific evidence to support a credibility finding). These inconsistencies led the ALJ to observe that the "bulk of physical examinations show the claimant has reported he is doing well with denial of chest pain, shortness of breath, or fatigue." [#13-2 at 20]. Finally, Mr. McGannon's physical activities were inconsistent with his complaints. In May 2012, Mr. McGannon reported he was walking twice a week for exercise and had shortness of breath upon walking long distances. [#13-9 at 382]. In April 2013, Mr. McGannon reported he played basketball the previous day. [#13-10 at 458]. Ultimately, I find that Mr. McGannon's commendable work history does not overwhelm the evidence the ALJ relied on, *cf. Shockley v. Colvin*, 564 F. App'x

935, 943 (10th Cir. 2014), and that the ALJ sufficiently linked her credibility finding to substantial evidence.

## CONCLUSION

The court is satisfied that the ALJ considered all relevant facts and that the record contains substantial evidence from which the Commissioner could properly conclude under the law and regulations that Mr. McGannon was not disabled within the meaning of Title II of the Social Security Act and therefore not eligible to receive Disability Insurance Benefits. Accordingly, **IT IS SO ORDERED** that the Commissioner's final decision is **AFFIRMED** and this civil action is **DISMISSED**, with each party to bear his own fees and costs.


DATED: August 10, 2016                    BY THE COURT:

                                          s/Nina Y. Wang
                                          Nina Y. Wang
                                          United States Magistrate Judge